J. Douglas McCalla, Wyoming Bar #5-1523
mccalla@spencelawyers.com
G. Bryan Ulmer, III, Wyoming Bar #6-2943
ulmer@spencelawyers.com
Tyson E. Logan, Wyoming Bar #6-3970
logan@spencelawyers.com
Claire Fuller, Wyoming Bar #7-6071
fuller@spencelawyers.com
THE SPENCE LAW FIRM, LLC
15 S. Jackson St., P.O. Box 548
Jackson, WY 83001
307-733-7290 / 307-733-5248 fax

Larissa A. McCalla, Wyoming Bar #6-2981
larissa@mccallalegalgroup.com
MCCALLA LEGAL GROUP
540 Ulm Rd.
Wyarno, WY 82845
307-699-0366

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| SAIJE M. POLLARD, and CHARLES E. POLLARD, JR., <br><br> Plaintiffs, <br><br> V. <br><br> HYDRO HORSE 1, INC., <br><br><br> Defendant. | Civil No. _____ <br><br><br><br> **PLAINTIFFS' COMPLAINT & DEMAND FOR JURY TRIAL** |

## I. INTRODUCTION

On March 10, 2017, an improperly installed and unvented gas-fired boiler spewed toxic carbon monoxide ("CO") gas through the Pollard family horse barn, poisoning 18-year-old Saije Pollard while she worked with her horses.



***Illustration 1:*** *photo of natural gas boiler installed in Pollard family barn, March 2017.*

Saije collapsed to the ground, unconscious.  Her dad, Charles Pollard, found her on the ground in the barn and rescued her from the toxic environment.  He rushed Saije to the emergency room, where (hours later) her carboxyhemoglobin level measured 35%.[1]  Saije survived the CO

---

[1] Saije's COHb level was measured hours after she was removed from the toxic environment.  The half-life of CO is estimated in the range of 4-6 hours— Saije Pollard's COHb level in the barn at the time she was acutely poisoned probably reached near lethal levels far greater than 35%.

poisoning incident, but she suffered serious injuries – including a permanent brain injury – as a result.

Defendant Hydro Horse 1, Inc., sold and installed the *natural gas* boiler to the Pollard family— but Hydro Horse 1 connected the boiler to a *propane* gas line.  In addition, Hydro Horse failed to connect any vent pipe to transport toxic exhaust outside the building, leaving the improperly installed boiler to vent CO and other exhaust fumes directly into the barn.

This action for money damages is brought against Hydro Horse 1, Inc., the defendant responsible for the plaintiffs' injuries and damages.

## II.  PARTIES

1.      Plaintiff Saije M. Pollard ("Saije") is a Wyoming citizen residing in Sheridan County, Wyoming.

2.      Plaintiff Charles E. Pollard, Jr. ("Chuck") is the father of Plaintiff Saije M. Pollard.

3.      Plaintiff Charles E. Pollard, Jr. is a Wyoming citizen residing in Sheridan County, Wyoming.

4.      Defendant Hydro Horse 1, Inc. ("Hydro Horse") is an Oregon corporation with its principal place of business in Oregon. The name and address of the registered agent on file with the Oregon Secretary of State is Susan Turner, 634 W. 3rd St., PO Box 1034, Merrill, OR 97633.

5.      Defendant Hydro Horse is a citizen of Oregon.

6.      As a corporation, Hydro Horse may only act through its officers, agents, or employees. Any act or omission of an officer, agent, or employee made while acting within the scope of authority delegated by the corporation, or within the scope of the duties of the employee, is the act or omission of the corporation.

### III. JURISDICTION & VENUE

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest and costs.

8.    This Court has personal jurisdiction over the defendant because the incidents that are the subject matter of this action occurred in Wyoming and this action arises out of the defendant's contacts with Wyoming.

9.    Additionally, this Court has personal jurisdiction over the defendant pursuant to Wyo. Stat. Ann. § 5-1-107(a) (Wyoming's jurisdictional "long arm" statute).

10.   This Court is the proper venue pursuant to 28 U.S.C. § 1391(b)(2) because the defendant's acts and omissions that harmed the plaintiffs occurred in Wyoming.

### IV. FACTS COMMON TO ALL CAUSES OF ACTION

### THE THREAT OF CO POISONING

11.   CO is a colorless, odorless, toxic and potentially deadly gas.

12.   Initially, CO poisoning mimics common ailments such as food poisoning, a headache, or the flu, at the same time intoxicating the victim, making it extremely difficult for victims to detect.

13.   CO deprives body organs and tissues — including the brain — of oxygen, in addition to causing cytotoxic and inflammatory processes, resulting in cell death.

14.   When breathed into the body, CO enters the bloodstream and triggers a damaging sequence of physiological changes that can continue to progress long after the victim is removed from the toxic environment.

15.     Any combustion appliance has the potential to produce CO, although the risk of dangerous levels of CO production increases dramatically for gas-fired appliances designed for one fuel type but connected to another.

16.     Gas-fired appliances like boilers, installed inside living spaces like a horse barn, must be vented to the outside so that dangerous exhaust gases including CO are not circulated into human breathing space.

17.     It is essential to install a CO alarm whenever a combustion device is operated in an enclosed place where people may be present.

18.     Hydro Horse is a sophisticated seller and installer of gas-fired appliances, having installed gas-fired boilers connected to underwater horse treadmills across the country prior to 2016.

19.     Hydro Horse actually knew or should have known of the danger of CO poisoning and the means of minimizing that danger.

**Hydro Horse Aquatic Treadmills**

20.     Defendant Hydro Horse has been marketing and maintaining horse products since 1987. Hydro Horse specializes in equine treadmill systems— essentially a combination of a treadmill, and a swimming pool, used to allow horses to exercise in a controlled, partially buoyant, environment.



***Illustration 2:*** *photo of aquatic treadmill inside Pollard family barn, September 2020.*

21.     An in-ground aquatic horse treadmill system consists of a walk-in, walk-out tub that is set into the ground in which a treadmill is set into the bottom. The tub is filled with heated water, and a horse is lead into the tub to exercise on the moving treadmill while in the water, taking stress and weight off of the horse's joints.

22.     Most horse treadmill systems are connected to a water heater / boiler system to heat the water for the pool/tub that the horse swims in.

23.     By 2016, Hydro Horse held itself out as experts in the equine treadmill system industry.

24.     By 2016, Hydro Horse had sold and installed equine treadmill systems across the country and internationally, and marketed its products and services widely.

25.    Hydro Horse sent a quote for a fully installed in-ground aquatic horse treadmill system to the Pollards.

### Pollard — Hydro Horse Communications and Work

26.    In 2016, Chuck Pollard and his wife, Tracie Pollard, researched aquatic horse treadmill systems and contacted Hydro Horse.

27.    Lyn Turner, a Hydro Horse owner and officer, guided Chuck through the in-ground aquatic horse treadmill options and purchase process.

28.    The Pollards ultimately contracted with Hydro Horse to purchase a completely installed in-ground aquatic horse treadmill system for $101,350.00.

29.    The contract included $18,000.00 for "Labor, materials and supplies needed to complete installation and operate."

30.    Hydro Horse determined the component parts it provided for the full in-ground aquatic horse treadmill system it sold to the Pollards, including the boiler that was used to heat water to fill the in-ground tub.

31.    For the Pollards, Hydro Horse indicated in its contract that the in-ground aquatic horse treadmill system would include a 250,000 BTU pool heater.

32.    The specific make and model of heater were not noted in the contract.

33.    The Pollards communicated to Hydro Horse that they wanted to use propane to fuel the system's boiler because there was no natural gas available and electricity would be too costly to use.

34.    Hydro Horse chose which heater (boiler) to use for this job.

**Hydro Horse Aquatic Treadmill & Boiler Install**

35.    In December of 2016, Hydro Horse began to install the in-ground aquatic horse treadmill

system at the Pollard's horse barn.

36.    The lines from the outdoor propane tanks to the horse barn were installed by contractors

hired by the Pollards.

37.    Hydro Horse ultimately selected and installed a *natural gas* Hayward pool and spa/hot tub

heater for the Pollard's in-ground aquatic horse treadmill system.

38.    While on site installing the system, the propane tanks and lines at the Pollard's horse barn

were openly visible to Hydro Horse and Lyn Turner.

39.    Hydro Horse connected the natural gas boiler to the propane gas line in the Pollard's horse

barn.

40.    It is unsafe to connect a boiler designed for natural gas, to a propane fuel source.

41.    A natural gas boiler fueled by propane gas burns improperly, creating high levels of CO

gas as a byproduct of (incomplete) combustion.

42.    Hydro Horse did not install any vent pipe for the boiler.

43.    When asked if the boiler needed to be vented, Lyn Turner of Hydro Horse stated that it did

not need to be vented.

44.    Mr. Turner stated that Hydro Horse often did not vent boilers it installs because the exhaust

can be used as a source of heat.

45.    Hydro Horse did not provide any system installation manuals, warranties, or warnings to

the Pollards.

46.    Hydro Horse provided minimal verbal training on how to use the system to the Pollards.

47.     Hydro Horse did not warn the Pollards that the in-ground aquatic horse treadmill system could produce dangerous levels of CO inside the horse barn.

48.     Hydro Horse did not install a CO alarm inside the barn.

49.     Hydro Horse did not warn the Pollards that they should install a CO alarm in the barn.

### March 10, 2017 CO Poisoning Incident

50.     March 10, 2017, on only the second day of trying out the new Hydro Horse treadmill, Saije entered the barn around 6 a.m. to turn on the aquatic horse treadmill system. While the system heated, waiting to swim her horses, Saije fed horses and cleaned stalls.

51.     As the in-ground aquatic horse treadmill system heated up, the natural gas boiler, burning propane gas, created high levels of CO gas as a result of incomplete combustion.

52.     Without any vent pipe to direct gas out of the building, the boiler spewed CO gas directly into the barn, filling the space with the toxic gas.

53.     The poison entered Saije's bloodstream as she worked, without warning, and eventually dropped her to the ground, unconscious.

54.     Around 1 p.m, Chuck found Saije lying on the ground next to her horse, inside the toxic barn (now) filled with CO gas.

55.     Saije was struggling to breathe, alone, on the ground, when Chuck found her.

56.     Neither Saije nor Chuck Pollard had any warning that the colorless, odorless, toxic gas was surrounding them inside the barn.

57.     Chuck lifted Saije to her feet, but she collapsed again. Chuck then lifted her off the ground and loaded her in the ranch truck. He rushed her, barely conscious, to the Sheridan Memorial Hospital Emergency Room.

58.   On the approximately 12-mile, drive to the Sheridan Memorial Hospital Emergency Room, Saije struggled to breathe.

59.   As of 3:10 p.m., Sheridan Memorial Hospital Emergency Room recorded Saije's carboxyhemoglobin level at 35% percent.

60.   At approximately 5 p.m., Emergency Room personnel transferred Saije via ground ambulance and then air ambulance to the Billings Medical Clinic for acute carbon monoxide poisoning care, including hyperbaric oxygen.

### Aftermath

61.   After the CO poisoning incident, and after learning that Hydro Horse had installed the wrong boiler, the Pollards contacted Hydro Horse.

62.   Hydro Horse returned to the Pollard's equestrian facility and removed the Hayward natural gas boiler and installed a propane boiler.

63.   Hydro Horse paid to have a contractor install a vent pipe for the (new) propane boiler.

64.   Both horses Saije swam on March 10, 2017 were seriously injured as a result of the CO poisoning:   both horses exhibited bizarre behavior after the incident and had to be euthanized.

65.   Saije Pollard sustained a permanent brain injury from the CO poisoning and she now suffers from severe headaches, cognitive deficits including difficulty with focus and attention, memory loss, multi-tasking, and other neuro-cognitive, emotional and psychological problems.

66.   Chuck Pollard suffered emotional trauma and mental injury from witnessing his daughter's critical condition and near death immediately following her CO poisoning.

## V.  FIRST CAUSE OF ACTION

### NEGLIGENCE, RECKLESSNESS, AND WILLFUL AND WANTON MISCONDUCT

67.    Hydro Horse owed Saije Pollard a duty to exercise reasonable care under the circumstances.

68.    Hydro Horse, through the acts and omissions of its officers, agents, and employees, breached and violated its duty of care to Saije Pollard.

69.    The acts and omissions constituting such breaches and violations include, but are not limited to, the following:

a.  Failure to exercise reasonable care under all of the circumstances;

b.  Failure to comply with industry safety standards;

c.  Failure to follow the boiler manufacturer's installation manual instructions;

d.  Failure to install the appropriate boiler for the application;

e.  Failure to vent the boiler in a reasonably safe manner;

f.  Failure to install a CO detector;

g.  Failure to warn the consumer regarding the need for a CO detector;

h.  Failure to identify a dangerous condition resulting from its work;

i.  Failure to perform a reasonable inspection of the system it installed at the barn;

j.  Failure to provide Plaintiffs with manuals, written instructions, or warranties related to the component parts of the in-ground aquatic horse treadmill system;

k.  Failure to train Plaintiffs how to use the system;

l.  Failure to warn of the unreasonably dangerous condition it created at the barn;

m.  Failure to train and supervise its employees; and

n.  Other negligence.

70.    Hydro Horse's negligent, reckless and willful and wanton acts and omissions directly, legally, and proximately caused, or played a substantial part in bringing about, serious injuries and damages to Saije Pollard, as more particularly set forth below in the section of this Complaint entitled "Damages".

## VI.  SECOND CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

71.    Hydro Horse owed Chuck Pollard a duty to exercise reasonable care under the circumstances.

72.    Hydro Horse, through the acts and omissions of its officers, agents, and employees, breached and violated its duty of care causing Saije's CO poisoning, and causing Chuck Pollard's serious emotional distress as a result of observing her serious injury without a material change in her condition or location at the time she was poisoned.

73.    Chuck Pollard observed the CO poisoning of his daughter Saije when he found her on the ground in the barn, inside the toxic environment, still being poisoned.

74.    Chuck Pollard observed the immediate aftermath of Saije's acute CO poisoning as he transported her to the Sheridan Memorial Hospital Emergency Room.

75.    Having observed his daughter's critical condition and near death during and immediately following her carbon monoxide poisoning, Chuck Pollard suffered emotional distress.

76.    Hydro Horse's negligent acts and omissions directly, legally, and proximately caused, or played a substantial part in bringing about, emotional distress and damages to Chuck Pollard as more particularly set forth below in the section of this complaint entitled "Damages."

## VII. DAMAGES

77.    As a direct and proximate result of Hydro Horse's negligent, reckless, willful and wanton, and otherwise wrongful acts and omissions, Saije and Chuck Pollard suffered serious injuries.

78.    Saije Pollard suffered injuries, including but not limited to permanent brain injury.

79.    Saije Pollard seeks damages including, but not limited to, the following:

   a.  Medical expenses, in an amount to be proven at trial;

   b.  Physical, mental, and emotional pain and suffering damages, in an amount to be proven at trial;

   c.  Loss of enjoyment of life, in an amount to be proven at trial;

   d.  Loss of earnings and earning capacity;

   e.  Past and future disability in an amount to be proven at trial;

   f.  Caretaking expenses for necessary help in the home, in an amount to be proven at trial;

   g.  Loss of two competition horses;

   h.  Punitive damages in a reasonable amount to be proven at trial, sufficient to adequately punish the defendants and to serve as a deterrent and warning against future conduct of the type alleged in this complaint;

   i.  Costs of this action and for further relief as the court deems equitable and proper.

80.    Chuck Pollard suffered injuries, including, but not limited to severe emotional distress.

81.    Chuck Pollard seeks damages including, but not limited to, the following:

   a.  Mental and emotional pain and suffering damages, in an amount to be proven at trial;

   b.  Loss of enjoyment of life, in an amount to be proven at trial;

c.   Punitive damages in a reasonable amount to be proven at trial, sufficient to adequately

punish the defendant and to serve as a deterrent and warning against future conduct of

the type alleged in this complaint; and

d.   Costs of this action and for further relief as the court deems equitable and proper.

## PRAYER FOR RELIEF

Plaintiffs request that this Court grant judgment as follows:

1.      Judgment against the defendant for special damages in an amount consistent with

the allegations contained herein and to be proven at trial;

2.      Judgment against the defendant for general damages in an amount consistent with

the allegations contained herein and to be proven at trial;

3.      Judgment against the defendant for punitive damages in a fair and reasonable

amount to be proven at trial; and

4.      Judgment for costs, interest and such other and further relief as the Court deems

just and equitable.


DATED this 9ᵗʰ day of November, 2020.

/s/ Tyson E. Logan
J. Douglas McCalla, Wyoming Bar #5-1523
G. Bryan Ulmer, III, Wyoming Bar #6-2943
Tyson E. Logan, Wyoming Bar #6-3970
Claire Fuller, Wyoming Bar #7-6071
THE SPENCE LAW FIRM, LLC
15 S.  Jackson, St., P.O. Box 548
Jackson, WY 83001
307-733-7290 / 307-733-5248 fax

Larissa A. McCalla, Wyoming Bar #6-2981
larissa@mccallalegalgroup.com
MCCALLA LEGAL GROUP
540 Ulm Rd.

Wyarno, WY 82845
307-699-0366

*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiffs, Saije M. Pollard and Charles E. Pollard, Jr., by and through their attorneys,

hereby request a trial by jury in the above-entitled cause of action.

DATED this 9th day of November, 2020.

/s/ Tyson E. Logan
J. Douglas McCalla, Wyoming Bar #5-1523
G. Bryan Ulmer, III, Wyoming Bar #6-2943
Tyson E. Logan, Wyoming Bar #6-3970
THE SPENCE LAW FIRM, LLC
15 S. Jackson, St., P.O. Box 548
Jackson, WY 83001
307-733-7290 / 307-733-5248 fax

Larissa A. McCalla, Wyoming Bar #6-2981
larissa@mccallalegalgroup.com
MCCALLA LEGAL GROUP
540 Ulm Rd.
Wyarno, WY 82845
307-699-0366

*Attorneys for Plaintiffs*